US District Court
Western District of Michigan
Northern Division

Krista Jones,

        Plaintiff

                                  Hon. Robert J. Jonker
                                  Magistrate Judge Maarten Vermaat

v                                  Cases ## 2:19-cv-254, 255
                                  Filed in Chippewa County: 11-26-19
                                  Removed to WD Michigan: 12-17-19

Interlake Steamship Company and
Marine Engineers Beneficial Association
District # 1-PCD,

        Defendants.
_____/

Ellis Boal (P10913)
9330 Woods Road
Charlevoix, MI  49720
231-547-2626
*ellisboal@voyager.net*

Mark L. Dobias (P35160)
546 Ashmun Street
Box 480
Sault Ste. Marie, MI  49783
906-632-8440
*dobiaslaw@sbcglobal.net*

Counsel for Plaintiff
_____/

## First Amended Complaint and Jury Demand

**Introduction and Jurisdiction**

    1.    This action, begun in Chippewa County by an employee against an

employer and a labor organization, seeks to remedy the employer's breach of a collective

bargaining agreement ("CBA") and practices, and the union's breach of its duty of fair representation, both in connection with the plaintiff-employee's being relieved of duty on May 30, 2019.  Regardless if the CBA is a creature of federal or state law, the court has jurisdiction under federal-question or diversity principles.

**Parties**

2.  Plaintiff Krista Jones lives at 9090 E Haypoint Road, Sault Ste. Marie, MI, 49783 in this division of this district, and until the above date was an employee of defendant Interlake Steamship Company ("Interlake").

3.  Defendant Interlake Steamship Company is an employer at 7300 Engle Road, Middleburg Heights, Ohio, 44130, and does business in this division of this district.

4.  Defendant Marine Engineers Beneficial Association District # 1-PCD ("MEBA") is a labor organization or union, recognized by Interlake as the sole and exclusive collective bargaining representative of its Interlake members.  It is located at 444 North Capitol Street NW, Suite 800, Washington, DC, 20001, has offices at 1322 Old River Road, Suite 301, Cleveland, OH, 44113, and does business in this division of this district.

**Background facts**

5.  Interlake ships cargo around the Great Lakes above Lake Ontario.  It has a fleet of seven ships.  Jones's ship was the Stewart J. Cort, which carried iron ore between

Superior Wisconsin and Chicago through the Soo Locks.

6. Before coming to Interlake Jones had schooling and employment in the culinary field.

7. Jones hired on at Interlake in December 2011 as a second cook in the galley. In 2014 she was promoted to relief steward.

8. In March 2018 she became the permanent steward, or cook, working seven days a week. She joined, paid a $3000 initiation fee, and began dues to MEBA.

9. Unlike the other MEBA members under the CBA Jones was not licensed.

10. In 2013 Defendants had negotiated a collective bargaining agreement ("CBA"), side letter, and associated practices which governed Jones's terms and conditions of employment.

11. The CBA required Jones to become and remain a MEBA member in good standing. Good standing meant she had to pay periodic dues, which under the MEBA bylaws were calculated the same way for all members.

12. The side letter permitted Interlake unilaterally to "set" the wages of cooks, unlike the wages of the other MEBA members whose wages MEBA bargained in article VII of the CBA. In practice Interlake has not set the wages of all cooks equally.

13. Under the side letter MEBA the grievance procedure for cooks did not cover discharges or notices of discharges.

14. The amount of her dues was based partially on a percent of her wage rate.

Interlake deducted that part from her paychecks and, so she understands, remitted it to MEBA. On November 21, 2019, at her request, her off-board supervisor Jason Toth in Ohio sent her personnel file by email. It did not contain a "check-off" authorization signed by Jones which would have allowed Interlake to make the dues deduction.

15. Under article XIII section 1(c)(2) of the CBA Jones's continuous service could be broken by "termination due to discharge for just cause," or for several other reasons which are listed but inapplicable to this dispute.

16. Though a willing member, Jones has not been a MEBA activist, has never sought or served in union office or filed a grievance, and is unfamiliar with the grievance procedure, appeal procedures, and other union practices.

17. Other than a verbal warning in about 2015, Interlake never suspended, gave her a written warning, or disciplined Jones for anything, and her annual appraisals were satisfactory or better.

**Jones is relieved of duty.**

18. On May 29, 2019, Jones's first day back from a vacation, she worked on the Cort, cooking all day.

19. All time aboard the ship is kept on the Soo's Eastern Time, regardless of the actual time zone the ship may be in.

20. She was a salaried employee with no set reporting time, except she had to be in the galley that day till 5:00 pm.

4

21. The captain (or "master") was Greg Sipper to whom she reported while he was on the ship. He was not on the ship during her work that day. Otherwise her supervisor was Toth.

22. A 6:00 pm sailing for Chicago was posted on the chalk board by the ladder, which is raised and lowered for people to board and leave the ship. The posted sailing times are not always reliable. According to Sipper's statement, once or more previously that day the posted time had been moved back.

23. About 5:40 pm she spoke with Tom Greenleaf, a wheelsman who was operating the ladder. The ship was loading ore. Greenleaf told Jones the loading would take time, and despite the posting the ship would not sail for an hour and a half. She had written her phone number on the chalk board, told Greenleaf it was there, and asked if he would give her a one-hour notice call (similar to a call typically given to Sipper), because she was going up the street to buy a clock. He said yes.

24. A wall clock was needed for the galley because the old one had broken during her vacation. A clock is necessary to time cooking conveniently and be ready for mealtimes. At a store she paid $10 out of pocket for a battery-operated model.

25. As corroborated by phone records, Jones returned with the clock to the ship at 6:54 pm. Starting to walk alone toward the ship along the gravel road across the broad yard, she could see it still at the dock. She was wearing the required orange vest, and most of the road is visible from the pilot house.

26.     According to his statement, by then Sipper was in the pilot house and Greenleaf had reported to him Jones's request for an advance call.  According to him this was 11 minutes before the ship actually sailed.  Sipper and Paul Christensen, Interlake's head of operations, spoke by phone.  They decided the Cort would leave without Jones.  It did so without a call to her.  According to Sipper this was at 7:45 pm, nearly an hour after Jones returned to board the ship and nearly two hours after the posted sailing time.  Jones saw that the ship then floated in the harbor for some 30 minutes – which was unusual – before actually getting underway.

27.     Jones placed a call to supervisor Toth in Cleveland.  He called back and said not to worry and everything would be ok.  Without naming them, he said three other people had missed another Interlake ship, the Lee Tregurtha, a week earlier in Marquette, this happens all the time, it is not a big deal, and people don't get fired for it.  He said to get a hotel room for the night.

28.     Jones learned later from Theresa Onizchak, the Tregurtha's second cook, that the three left behind in Marquette had been let back on the Tregurtha at the Soo.

29.     The Cort was not scheduled back to Superior for about a week.  Her purse and ID were still aboard the ship, as were her other clothes and personal items.  Instead of getting a hotel and driving the next day to Sault Ste. Marie (her home), she decided to drive there through the night and meet the downbound Cort at the Soo Locks.  She and Toth texted each other as she drove home.  He suggested, but did not instruct her, to get

a hotel if she had any issues.

30. The next morning, May 30, she called and spoke to Toth and Christensen. They said the company was relieving her of duty, supposedly because of complaints from crew members. Christensen added that he hoped the clock was worth it because she lost her job because of it. Jones stated the company's action was unfair.

31. In the day-long trip between Superior and the Soo, the captain and crew had no cook. Only the second cook was aboard. At the Soo, Interlake replaced Jones with Susan Doorman as cook.

32. When the Cort next came downbound through the Locks a week later, Jones sent the clock aboard via the grub boat. Interlake has not reimbursed her for it.

33. At the same time she was able to retrieve her clothes and purse and ID.

34. Interlake issued Jones no written notice of its action or the reasons.

35. About a week later Interlake falsely reported to the state unemployment office she had been laid off.

**Comparators**

36. Toth's unnamed three employees who missed the ship in Marquette returned to work with no discipline or discipline less than discharge.

37. In January 2019 acting chief Mark McTaggart missed the Cort in Superior because he had returned to the ship drunk was sent to rehab at a hospital. Within a couple of weeks he returned to work as a first engineer on a different Interlake ship, the

James L. Overstar.

38. In the summer of 2018 second cook Tom Moore missed a different Interlake ship, the James L Barker, because of an arrest for drunk driving in a company vehicle. He served jail time. A year later he came back to work on the Cort as a second cook.

**Jones's attempt and the union's refusal to grieve**

39. MEBA did not maintain a representative on the Cort or in the fleet.

40. On May 31 Jones called Mark Gallagher, MEBA's contract rep, to explain the facts and say she needed a grievance. Gallagher said nothing about Jones needing to fill out a "grievance form" on MEBA's website. He made notes and said he would forward them to MEBA Branch Agent Tracy Burke, who had grievancing authority.

41. The same day she called Burke and again explained the facts. He also said nothing about her needing to submit a grievance form. Rather, he said because she missed the ship the case was closed.

42. On June 4 she called Gallagher and again reviewed the facts.

43. On June 13 Gallagher emailed Jones saying Toth told him he would send additional information to substantiate she had performance-related issues from the captain and crew.

44. On or about June 28 she received a copy of the CBA and side letter in the mail from MEBA after mailing a $25 money order for it.[1] This was MEBA's first notice

---

1 Compare 29 USC 414.

8

to Jones it had agreed with Interlake that, regardless of merit, it would not process termination grievances for cooks. Jones had always thought the union would stand up for her.

45. Gallagher referred Jones to Jason Callahan, MEBA's Atlantic Coast Vice-President, who is above Tracy Burke.

46. On July 2 she talked with Callahan. She reminded him of her good appraisals.

47. At Callahan's request, on July 8 she provided favorable statements and emails from employees and passengers she had cooked for.

48. On July 31 she spoke with Callahan again. He said she was a terrible cook, and the statements were not enough to overturn the termination.

49. On August 5 she emailed Callahan asking that a grievance be processed to arbitration.

50. He emailed back asserting she had "miss[ed] the grievance deadline" but even despite this the union could not prevail at arbitration, listing several reasons, none of which referenced the side letter or its prohibition of grievances for cooks in these circumstances.

51. Promptly she appealed to the DEC.

52. On August 17 she emailed MEBA president Marshall Ainley noting that she had requested a grievance from Gallagher on May 31.

53. On August 19 she emailed Ainley asking for all Interlake-MEBA correspondence emails pertaining to her case.  He acknowledged the request by return email but sent her nothing.

54. On August 30 the DEC denied her appeal, arguing:

    1. the company had counseled her regarding poor performance (which was untrue),

    2. she had ignored the posted sailing board (which was untrue),

    3. she had gone home instead of getting a hotel in town to be billed to the company (which was irrelevant),

    4. union officials had directed her to fill out a grievance form from the union website (which was only true in that she was informed of the website on August 5 and she had promptly complied when the union sent her a link to it),

    5. the union had no record of any grievance other than one she submitted after receiving the website link (which was true but irrelevant), and

    6. under the side letter the union cannot grieve terminations for cooks (which was true).

**Claims**

55. Whether regarded under federal or state law, as the sole and exclusive representative of its Interlake members including the cooks, MEBA owed them a duty of fair representation.

56. Interlake's relieving of Jones of duty on May 30 lacked just cause under company past practices and the CBA, in violation of 29 USC 185(a) or state contract law, as was also its failure to reimburse her for the clock.

57. MEBA's failure to provide Jones with grievance documents, to which she had a right if they existed under *Branch 529 Letter Carriers (USPS)*, 319 NLRB 879 (1995), means they did not exist, which in turn confirms that MEBA did not invoke the grievance procedure with Interlake.

58. MEBA's negotiation of the side letter in 2013, as well as its invocation of it in 2019, violated its duty of fair representation toward cooks, insofar as – unlike how it treats the other members though everyone's dues are calculated the same way – it arbitrarily and perfunctorily refuses to represent them as to wages, safety, disparate treatment of similarly situated employees, and other fundamental terms and conditions of employment.

59. MEBA's refusal to grieve and arbitrate her termination, and its requirement that she pay for a copy of the CBA were arbitrary and perfunctory, and violations of its duty of fair representation.

60. As a result Jones has lost significant sums of wages and benefits, exceeding $35,000 to date.

**Relief requested**

61. Wherefore Jones asks the court to try the facts of this case to a jury, and order her reinstatement, and backpay, interest, and benefits commensurate with the rank, seniority, promotions, and raises Jones would have attained had she not been fired, including:

  a. voiding the side letter, albeit retaining Jones' ability to enforce any terms in it favorable to her,[2]

  b. compensation for lost wages, benefits, and interest,

  c. $10 for the clock,

  d. compensation for any tax penalty she might incur due to receiving an unusually large amount of backpay income in one year,

  e. $25 for the CBA,

  f. compensation for mental anguish wholly or partially attributable to MEBA,

  g. costs and attorney fees, and

  h. any other equitable relief to which she might be entitled.

---

[2] *National Licorice Co v NLRB*, 309 NLRB 350, 365 (1940); *Associated Truck Lines*, 239 NLRB 917, 921 (1978), enf'd 653 F2d 141 (CA6, 1981).

          Respectfully submitted,

          /s/_____
          Ellis Boal (P10913)
          Counsel for Plaintiff
          9330 Woods Road
          Charlevoix, MI 49720
          231-547-2626
          *ellisboal@voyager.net*

          /s/_____
          Mark L. Dobias (P35160)
          Counsel for Plaintiff
          546 Ashmun Street
          Box 480
          Sault Ste. Marie, MI 49783
          906-632-8440
          *dobiaslaw@sbcglobal.net*

Dated: February 27, 2020